## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE
APPLICATION OF THE UNITED
STATES OF AMERICA FOR SEARCH
AND SEIZURE WARRANTS FOR 27
Langtree Dr., Pickerington, OHIO 43147;
TO INCLUDE ANY VEHICLES AND
OUTBUILDINGS LOCATED ON THE
PROPERTY

Case No. 2:24-mj-497

**UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Teresa J. Petit, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives (ATF), being duly sworn, depose and state as follows:

INTRODUCTION

1.      I am an "investigative or law enforcement officer of the United States" within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated

in Section 2516 of Title 18.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), and have been so since 2014, and I am currently assigned to the Columbus,

Ohio, Field Office, Group IV.

3.      I have participated in numerous investigations focusing on firearms trafficking,

gangs, and the distribution of illegal narcotics.  I have conducted covert surveillance of suspected

traffickers, interviewed numerous individuals involved in gangs, the illegal firearms trade, and/or

narcotic trafficking trade.  I have been a member of surveillance teams, participated in the

execution of numerous state and federal search and arrest warrants involving firearms and/or

illegal narcotic traffickers and violent offenders, and participated in the seizure of numerous

1

firearms and controlled dangerous substances. Through my training, education, and experience, I have become familiar with the manner in which firearms intended for criminal use are transported, stored, and resold, similar to the transportation, storage and distribution of illegal narcotics. I am also familiar with the methods of payment for such unlawful transfers of firearms and/or narcotics and the distribution and the manner in which firearms and/or narcotic traffickers communicate with each other.

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, police officers, witnesses, records, and reports. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.      I have not included all the information relevant to the investigation in this Affidavit, but I do not believe that I have omitted any information that would have a tendency to defeat a showing of probable cause. To the best of my knowledge and belief, all statements made in this Affidavit are true and correct.

6.      I submit this Affidavit in support of an application for a warrant to search at the residence of 27 Langtree Dr., Pickerington, OH, 43147, to include any vehicles and outbuildings on the curtilage of the property (hereinafter "TARGET PREMISES") further described in Attachment A.

7.      Based on the facts set forth in this Affidavit, there is probable cause to believe that Charles E. WOODEN, Courtney D. MUSICK, (hereinafter "WOODEN" and "MUSICK"), and others both known and unknown have committed violations of the following federal laws: Title 21, United States Code (U.S.C.), Section 846, that is, Attempt or Conspiracy; Title 21, U.S.C., Section 841(a)(1), that is, it shall be unlawful for any person to manufacture, distribute, or

dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance; Title 21, U.S.C., Section 841(b)(1)(A), that is, it shall be unlawful to distribute or possess with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance; Title 18, U.S.C., Section 1956(h), that is, laundering of monetary instruments; and Title 18, U.S.C., Section 1957, that is, engaging in monetary transactions in property derived from specified unlawful activities. There is also probable cause to search the TARGET PREMISES described in Attachment A for evidence, instrumentalities, and/or fruits of the above crimes, as further described in Attachment B.

8.      Because this Affidavit is being submitted for the limited purpose of seeking authorization to execute a search warrant on the TARGET PREMISES, I have not set forth each and every fact learned during the course of this investigation. I am not relying upon facts not set forth herein in reaching my conclusion that a warrant should be issued. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this Affidavit in support of the application for a search warrant.

## FACTS ESTABLISHING PROBABLE CAUSE

9.      On or about June 6, 2022, officers from the Columbus Division of Police (CPD) were dispatched to the area of 5406 Wrigley Street, Canal Winchester, OH. Upon arrival officers located an unconscious and unresponsive female sitting in the driver's seat of a vehicle, located inside the attached garage at 5406 Wrigley Street. Officers conducted a sweep of the structure for any other persons in need of medical aid, and while doing so they observed a "kilo" press, a large bag containing a white powder, a money counter, firearms, and other items indicative of bulk

3

narcotic distribution.

10.    The unconscious female was slumped over the wheel of a Jeep Wrangler Unlimited, bearing Ohio license plate BZJEEP. She was later identified as Brittny McDougald. Medics with the Columbus Division of Fire (CFD) responded and pronounced McDougald deceased. The Franklin County Coroner's Office also responded, and the preliminary investigation indicated that McDougald passed away from a drug overdose. McDougald's cause of death was later confirmed through an autopsy conducted by the Franklin Co., Ohio, Office of the Coroner to be due to acute fentanyl toxicity.

11.    Continuing on or about June 6, 2022, the initial responding officers from CPD secured the residence and contacted a CPD Narcotics Detective, who later received a search warrant for the residence. The execution of the search warrant yielded approximately 84 combined kilograms of cocaine and fentanyl, approximately 22 firearms, numerous boxes of ammunition, approximately $155,000 U.S. currency, ledgers, documents of indicia, two (2) laptop computers, FedEx shipping labels and boxes, twenty-nine (29) cellular telephones, money counters, kilogram presses, and a large box containing marijuana. The Jeep was also towed from the residence to the CPD impound lot where it was secured pending a separate search warrant. As a result of the recovery, investigators began an investigation into the drug trafficking organization (DTO) involving Charles WOODEN, Brittny McDougald, Gregory FOUNTAIN, Alexis ORTEGA, Carl CAMPBELL, Courtney MUSICK, and others known and unknown to law enforcement (collectively referred to hereinafter as "TARGET SUBJECTS").

12.    Upon executing a search warrant on the Jeep, investigators recovered two (2) additional cellular telephones, documents of indicia, as well as photo identification cards for Brittny McDougald, Brittny Stewart, and Melissa Abrego. Investigators determined that Stewart

4

was Brittny McDougald's maiden name and determined that Melissa Abrego is an alias utilized by Brittny McDougald. The photo identification card for Melissa Abrego contained a photograph of who investigators know to be Brittny McDougald.

13.     Investigators reviewed the documents recovered from both the residence located at 5406 Wrigley Street and the vehicle and observed several other names. Investigators observed the name "G. FOUNTAIN" as the recipient listed on numerous FedEx packages in the residence, as well as Melissa Abrego. Additionally, the name "Simone Silas" was also documented on several ledgers and other documents recovered in the residence.

14.     Rental records were obtained from American Homes 4 Rent that indicated the residence of 5406 Wrigley Street, Canal Winchester, OH 43110, was rented to "Simone Silas" initially on May 8, 2018, with an annual lease renewal thereafter, through May 8, 2023. American Homes 4 Rent also provided the photo identification provided by "Simone Silas" at the time of the lease application. The photo identification card provided by "Simone Silas," contained a photograph of who investigators know to be Brittny McDougald. The photo identification card was a Texas Driver License and when checked through the Texas database was not a valid identification number issued in the state of Texas. Investigators determined that "Simone Silas" was another alias utilized by Brittny McDougald.

15.     Investigators obtained forensic copies of each of the cellular telephone(s) recovered from McDougald's Jeep Wrangler. While reviewing the forensic copy of the Apple iPhone, described by McDougald's family as her personal cellular telephone, investigators identified numerous, lengthy conversations utilizing the WhatsApp platform, between McDougald and others. Of investigative significance is the WhatsApp conversation between profile name "B" (McDougald) and "9zeros" with the associated telephone number of (614) 584-7475. Utilizing

law enforcement databases, investigators were able to determine that the telephone number associated to "9zeros" belonged to Charles WOODEN. The conversations between McDougald and WOODEN date back to approximately 2018. WOODEN utilized many different telephone numbers but most consistently the WhatsApp profile name of "9zeros." Over the course of the approximately four (4) years of conversation, WOODEN directed McDougald where to ship packages containing suspected narcotics and/or bulk currency, discussed recruiting others into shipping and receiving packages, cleaning up around the stash house, obtaining supplies, exchanged photographs and videos of bulk currency and suspected narcotics, planned the payment of the bills at the various stash locations, and so forth. Specifically, on May 31, 2022, WOODEN sent McDougald a message that stated, "I will put NC by the couch but you will need to put them together (6piece)." When investigators executed the search warrant on June 6, 2022, at the residence of 5406 Wrigley Street, there were six (6) kilograms of cocaine located next to the couch, and FedEx labels had been created for an address in North Carolina.

16.     On or about January 20, 2022, WOODEN completed an application for an Ohio Driver License. In column A, the application contains handwritten personal identifying information completed by WOODEN. This includes a block for a telephone number where he provided the number of (614) 584-7475, and a block for an address where he provided the address of 2463 Century Drive, Columbus, OH 43211. An Ohio Driver's License was subsequently issued to WOODEN that day.

17.     On or about August 10, 2022, investigators obtained a pen register/E-911 ping order on WOODEN's aforementioned telephone number. Analysis of the historical call detail records obtained with the court order, indicated that WOODEN had never directly contacted McDougald until June 6, 2022, the date McDougald was found deceased. All other communication between

McDougald and WOODEN appeared to occur on WhatsApp. The records show that WOODEN attempted four (4) outgoing telephone calls to McDougald exclusively on June 6, 2022, all calls went unanswered as it is suspected she was already deceased.

18.     A subpoena was sent to FedEx Express and FedEx Ground related to the information obtained off the labels located at Wrigley Street. Review of those records indicate hundreds of packages have been sent from the accounts identified. The records show that packages have been sent both to and from California and Ohio as well as but not limited to Texas, Florida, and North Carolina. The names on the labels are variants of the more than eight (8) aliases utilized by the TARGET SUBJECTS. Most commonly the packages were shipped to a Fed Ex Office Print and Ship Center and marked to be held at the location to be picked up by an individual.

19.     In addition to other subpoenas investigators received records related to the acquisition of several houses that were maintained for the promotion of the DTO activities. Records received from Invitation Homes, indicated that a lease was entered by ██████████ on or about February 12, 2018, through March 4, 2019, for the residence located at 4566 E. Larkspur Circle, Anaheim, CA 92087. Investigators were able to identify that ████████ was an alias that belonged to ███████████████ The information provided to Invitation Homes in furtherance of this alias was documented on a ledger that was recovered from the search warrant at Wrigley St. Of significance related to ████████ he was murdered in Columbus, OH, on approximately March 29, 2018. At the time of his homicide ████████ was a fugitive from justice related to narcotics possession and drug trafficking in Delaware County, Ohio. During that investigation, a GPS tracking device had been installed on ████████ known vehicle that collected location data on Century Drive, Columbus, OH, a residence associated to WOODEN. A few days prior to the murder, license plate reader (LPR) technology captured a vehicle known to

be driven by ████████ located in the rear of 1157 East 18th Avenue, Columbus, Ohio, a property owned by Musick Properties LLC.

20.    The rent for 4566 E. Larkspur Circle continued to be paid after ████████ death. Investigators located a WhatsApp conversation in the extraction from McDougald's cellular phone dated October 11-12, 2018, between McDougald and CAMPBELL.  In the conversation, McDougald and CAMPBELL discussed online tracking and retrieval of packages shipped from Columbus, Ohio.  CAMPBELL informed McDougald he was done retrieving packages, and she sent him a message stating, "4566 e larkspur circle…", in what appears to be a directive to meet her at the address. Fed Ex records indicate that CAMPBELL picked up two (2) packages in San Diego, CA, on October 11, 2018.

21.    Investigators received records from The Boutique Real Estate Group related to a residence located at 320 Somerset Drive, Placentia, CA 92870.  ORTEGA entered a lease for this residence dated June 1, 2019, through May 31, 2020, with the option to go month to month thereafter.  Contained in the records from The Boutique Real Estate Group were fictious documents provided to establish ORTEGA's employment. Investigators spoke with neighbors of this residence and learned that during the specified timeframe there was little activity at the residence, which was described as odd behavior for their neighborhood. Another neighbor stated they rarely saw occupants at the residence except for 1 or 2 times a month for several days at a time and then the house seemed empty again.  Neighbors recalled seeing both a black female and black male in varying times at the residence.  Additionally, they described when there were occupants at the residence, they would often burn things in the back yard.  The smell from the burning items was described as a strong-foul smell that was not from a traditional wood fire. This neighbor indicated on one occasion they knocked on the door of the residence to express concern

for the strong odor and no one answered the door. Investigators know that the DTO would often burn their packaging as a manner of disposal to elude detection.

22.     Another residence that investigators discovered with relation to the DTO was located at 4107 Mustang Rd., Pearland, TX 77584. ORTEGA entered the lease for this residence from July 1, 2020, through June 30, 2021. Investigators located a WhatsApp conversation between McDougald and WOODEN regarding a residence ORTEGA had applied to rent.

> **9zeros**: sent a screenshot of a conversation with ORTEGA regarding residence
>
> **9zeros**: Lex said shes needs a transfer letter. I'm assuming you two have not seen ea other (even though ya'll live in the same city with access to the same house) since she is contacting me about this
>
> **B**: I sent her one via email last week and yes we have been in the same house she is just being petty. *(she then sends a screenshot of the message she sent ORTEGA)*
>
> **9zeros**: If ya'll two are in the same house, ya'll can work it out. You would think this would be the ideal time to sit a table and lock in a fucking house in Houston, Maybe I'm tripping. Maybe I'm confusing are company with a multi million dollar company when in reality we are a middle school girls cafeteria. Let me know how it goes.
>
> **B**: You hired her.
>
> **9zeros**: I hired both of ya'll.

23.     Investigators are aware that WOODEN was convicted in 1997 of Aggravated Robbery (F-1) and sentenced to eight (8) years in the Ohio Department of Rehabilitation (ODRC). Records indicate while WOODEN was incarcerated, he and _____ were together in the same facility for a period. Additionally, in 2008, WOODEN was charged for Possession and Trafficking

in Drugs (F-1), with a Major Drug Offender (MDO) specification. Court records indicate that on February 20, 2009, WOODEN's bond was ordered forfeited, indicating that he failed to appear for required court hearings. Almost thirteen (13) years later, on or about November 8, 2022, in the Franklin County Common Pleas court, WOODEN entered a plea to a lesser included offense of Trafficking in Drugs (F-3) and Possession of Drugs (F-3), without the MDO specification. The court accepted his plea and sentenced WOODEN to five (5) years of community control with a mandatory fine of $10,000. On or about November 30, 2022, the community control was terminated by the court after complete payment of the $10,000 fine.

24.     Investigators received records from the Wright-Patt Credit Union that indicated on July 3, 2022, WOODEN completed a loan application for the purchase of a 2022 GMC Sierra, Denali trim, pick-up truck. WOODEN was approved for the loan amount of $49,172.00 with a $20,000 down payment. The vehicle was later registered to WOODEN through the Ohio Bureau of Motor Vehicles, with license plate JWD6244, at the residence of 2463 Century Drive, Columbus, OH 43211, with telephone number (614) 364-1233. The loan application also indicated that WOODEN has been an "account manager" at Strongbridge Global LLC located at 620 Taylor Station Drive, Gahanna, OH for five (5) years and six (6) months. According to the Ohio Secretary of State business filings, WOODEN originally filed the Articles of Organization for said business on February 19, 2022, indicating that the entity had not even been established long enough to fulfill is stated term of employment.

25.     Between the dates of August 16 through September 28, 2022, investigators conducted surveillance and observed WOODEN regularly driving the GMC pick-up truck. WOODEN has been observed on a few occasions at Strongbridge Global LLC but was most often observed parked in the driveway at and coming and going from the TARGET PREMISES. The

residence on Langtree appears to be WOODEN's primary residence in contrast to the residence listed on his Ohio Driver's License application. WOODEN and MUSICK have both been observed freely and independently gaining access to the TARGET PREMISES.

26.     MUSICK acquired the TARGET PREMISES from Maronda Homes for $212,455 on September 18, 2014. Financial records indicate that MUSICK fulfilled the loan used to acquire the TARGET PREMISES in less than three (3) years. She would later use the TARGET PREMISES as collateral for a Home Equity Line of Credit, the funds of which were used to finance and build MUSICK's real estate portfolio. To accomplish the purchase of the TARGET PREMISES, MUSICK obtained a loan which was serviced by Cenlar FSB. Cenlar FSB records show that the loan was originated in the amount of $180,587. From October 2014 through November 2015, she made payments resulting in the reduction of the loan principal balance by approximately $3,600, to $176,894.17. From December 21, 2015, forward, payments on the loan totaling $190,940.46 were made. Cenlar FSB records show that each of the payments was made using funds and/or accounts in the name of ▓▓▓▓ MUSICK's father.

27.     Bank and other records indicate that MUSICK controlled ▓▓ bank accounts and used the accounts and ▓▓ income to disguise part of the source of funds used to build and maintain the real estate portfolio she amassed beginning in 2014. Bank records show that ▓▓ various bank accounts received normal payroll deposits from his employment with the U.S. Postal Service; deposits from ▓▓ earnings completing home repair services; cash deposits; deposits explicitly from MUSICK; and other miscellaneous deposits. However, the accounts lacked records of everyday living expenditures which should have been present. The totality of the information presented in this affidavit indicates that MUSICK commingled some DTO cash, presumably received from WOODEN, with ▓▓ payroll checks and other funds and used the

11

commingled funds for her own purposes. MUSICK then paid ▮ in cash or paid for his living expenses in cash, the source of which had to have been proceeds of the DTO. In doing so, MUSICK obfuscated the true source of the funds being used in relation to the real estate portfolio.

28.    Investigators obtained MUSICK's tax records for 2014 and 2015. These records show that in 2014 and 2015, MUSICK claimed adjusted gross incomes of $52,973 and $40,018, respectively. Furthermore, these income figures were comprised wholly or mostly from wages of $55,132 and $34,521, respectively. MUSICK would have incurred normal living expenses throughout 2014 and 2015. These normal living expenditures would have consumed MUSICK's earnings. As such, the funds used to make the excessive payments on the Cenlar FSB loan in 2016 and 2017 were not accumulated through MUSICKS's legitimate income in 2014 or 2015.

29.    Investigators obtained MUSICK's 2016 tax records via ex-parte order. The tax records show that in 2016, MUSICK claimed $37,649 of total income, which was comprised mostly of wages totaling $21,729 and gross rental income of $33,151 less expenses, resulting in net rental income totaling $14,832. MUSICK's total income as reported on her Form 1040 is over $87,000 less than the payments made on the loan for the TARGET PREMISES in that year.

30.    Investigators obtained MUSICK's 2017 tax records via ex-parte order. The tax records show that in 2017, she claimed $50,004 of total income, which was comprised mostly of wages totaling $20,653 and gross rental income totaling $45,552 less expenses, resulting in net rental income totaling $27,905. MUSICK's total income as reported on her Form 1040 is over $8,000 less than the payments made on the loan for the TARGET PREMISES in that year, all of which were made in the first five months of the year.

31.    MUSICK did not have assets or legitimate sources of income to have allowed her to provide the funds to ▮ to make the payments to Cenlar FSB for the TARGET PREMISES

from December 2015 through May 2017. ▮▮▮▮▮ bank records show that MUSICK controlled and benefitted substantially from deposits into the accounts from at least 2017 through 2022. MUSICK, through ▮▮▮ fulfilled the loan on the TARGET PREMISES during the approximate time that WOODEN "perfected" the DTO. WOODEN's own words, as the username "9zeros" recovered from the What's App conversation dated October 12, 2019, confirm this timeframe to investigators. He stated the following:

> **9zeros**: Man I'm Pissed. Now we mailing work to places that we don't have id s for Hoping we can freestyle and finesse a situation. Something completely unnecessary since we perfected this whole process four years ago. But stupidity and laziness is the enemy of perfection.

32.     This statement indicates that Wooden "perfected this whole process" at approximately the same time (October 2015) that the significant payments on 27 Langtree Drive, detailed above, began (December 2015). Investigators obtained records via ex-parte order that indicate WOODEN did not file any Forms 1040, or Individual Income Tax Returns, for at least 2014 through 2021.

33.     MUSICK established Musick Properties LLC on November 6, 2014, by filing Articles of Organization with the Ohio Secretary of State. She is listed on the documents as statutory agent and a "member, manager or other representative" of the company. Her address, shown on the document is the TARGET PREMISES. Between September 2014 and October 2022, MUSICK, personally and through her company, Musick Properties LLC, acquired at least 28 properties in and around Columbus, OH. Some of the properties were used as rental properties while others were renovated and sold. Eleven of those properties, renovated with drug proceeds and the rental income of which was comingled with drug proceeds in bank accounts MUSICK controlled, were then used as collateral on a $1,329,250 loan from Lima One Capital. The funds were then used to purchase, in the names of other LLCs (*each of which MUSICK is listed as the*

13

*account owner*) 18 properties in and around Cleveland, Ohio. At least seven (7) of those properties have since been resold. Investigators also know that between January 1, 2017, through December 31, 2022, MUSICK controlled approximately nineteen (19) varying financial accounts in all or part of each year. Those nineteen (19) accounts are comprised of financial accounts, loan accounts, credit card accounts, and Cash App.

34.     Your affiant received records from The Columbus Academy, that show that WOODEN and MUSICK share a child born in April of 2013 and one born in December of 2015. The Columbus Academy records show that when completing the Parent's Financial Statement in December of 2021, WOODEN or MUSICK entered WOODEN's home address as the TARGET PREMISES. Investigative activities and other records indicate that WOODEN and MUSICK have lived together at the TARGET PREMISES since at least 2017.

35.     On September 2, 2022, investigators conducted a trash pull with the assistance of the local refuse company at TARGET PREMISES. Investigators located an identification card bearing the name of "Donald Littlefield" with a photograph of WOODEN. The identification card was issued from the AimHi Family Firearms Center and was issued on May 2, 2017. Investigators spoke with representatives from AimHi Family Firearms Center and learned that, to obtain a Range Certification card, the patron must present another photo identification card. The number that appears above the barcode on the Range Certification card is the corresponding number from the identification provided by the patron. Investigators also learned that MUSICK was a customer at their establishment on the same date.

36.     Investigators compared the number series of the I.D. Checking Guide and determined the number series is most like identifications issued by the state of Arizona. With this information, investigators ran a query in NCIC and established that WOODEN obtained an

14

Arizona driver license on October 10, 2013, in the alias name of "Donald Littlefield." After obtaining this information, investigators then reviewed the Fed Ex shipping records and identified approximately 80 times where packages were shipped to or from "D. Littlefield." The date range for Littlefield's packages is from July 2018 through April 2020. Additionally, there were seven (7) packages between January 2020 and January 2022 that were shipped to Arizona.

37.     Returning to the WhatsApp conversations between WOODEN and McDougald, on February 25, 2022, he asked her if she was available to look into a "track." Investigators have learned that "track" is a reference to a FedEx tracking number. McDougald agreed and asked for the tracking number information. WOODEN sent her an image of a FedEx receipt containing the tracking information. WOODEN expressed concern for the package stating, "I used my actual face on this." They continued to exchange messages regarding the package, and he asked her to call FedEx and inquire about the status of the package, he also provided the name for the receiver as ████████████ and the name of the sender as "Donald Littlefield." The records obtained from FedEx Express indicated that other packages had previously been shipped to Arizona for ████ ████████.

38.     Investigators reviewed the lengthy conversations from WhatsApp between WOODEN and McDougald. Those conversations were supported in part by records obtained from Fed Ex, Invitation Homes, airline entities, financial account expenditures, and numerous other sources. In total, WOODEN conspired with and directed McDougald, FOUNTAIN, ORTEGA, CAMPBELL, and others in the shipment and use of at least $24,848,490.00 derived from the sale of controlled substances to purchase additional controlled substances.

39.     On or about November 10, 2022, investigators conducted physical surveillance on WOODEN as he traveled to several locations in Cleveland, OH. Notably, WOODEN entered a

Fed Ex Print and Ship Center located in Willougby, OH. Investigators spoke with the store manager and reviewed the camera related to WOODEN's activities in the store. WOODEN entered the premises speaking on a cellular telephone. He entered the store holding only what appeared to be a portfolio/notebook and walked into the self-service area of the store. WOODEN did not conduct any business in the store before returning to his vehicle and leaving the parking lot.

40. Investigators reviewed data generated from the GPS tracker on WOODEN's vehicle and the location data generated from a pen register/trap and trace on telephone number (614) 364-1233, another phone number associated to WOODEN, indicated several locations in Cleveland, OH, that WOODEN has visited on a repeated basis. Investigators initially identified thirteen (13) properties located in the greater Cleveland, OH area that were all purchased on or about October 27, 2022. The properties were purchased utilizing the names of CCMW Investments LLC, DAKM Holdings LLC, and WFAM Investments LLC. The location data generated from both the tracker on WOODEN's vehicle and the Federal pen register on WOODEN's telephone number (614) 364-1233 place him at different times on varying days at the locations owned by each of the aforementioned LLCs.

41. Investigators received records related to the creation of the aforementioned LLCs and learned of two additional LLCs in the names of MFAM Properties and ADM Investments were also created and associated to other LLCs. Records also indicated that in late October 2022 in Cuyahoga County, Ohio, a total of 18 properties were purchased by this grouping of LLCs for a total purchase price of just under $1,000,000.00. The records indicated that the LLC's were all created MUSICK. Those 18 properties are a portion of what investigators have referred to as MUSICK's "real estate portfolio."

42.     Investigators learned through review of the data generated from the pen register that on or about December 10-11, 2022, WOODEN traveled to Phoenix, Arizona. Records were subsequently received from four (4) major airlines that indicate the recent trip was the only trip WOODEN has flown during the seven (7) year look back period utilizing his official government name. The records indicate that WOODEN has flown on more than fifty (50) occasions utilizing the alias of LITTLEFIELD. The records also display numerous occasions where MUSICK traveled with WOODEN when he was a ticketed passenger utilizing the LITTLEFIELD alias. The passenger records include that telephone numbers associated to WOODEN were provided when booking airline tickets with the LITTLEFIELD alias.

43.     The data collected from a previously authorized search warrant on WOODEN's cellular telephone indicated that he traveled to Southern California in early January 2023, the source location where the narcotics were previously obtained for the conspiracy. Additional location data from the cellular telephone indicated that WOODEN was in the area of a LifeTime Fitness Center while in Southern California. Investigators obtained records that confirmed WOODEN had visited the LifeTime Fitness Center located in Laguna Niguel, CA on January 8 and 9, 2023, utilizing a membership in his own name. Investigators also learned that WOODEN had a prior membership at LifeTime Fitness utilizing the alias of Donald LITTLEFIELD. The membership records for LITTLEFIELD contain a photograph of the individual that investigators know to be WOODEN. The membership in WOODEN's name was created on September 9, 2022, while the last time he utilized the LITTLEFIELD membership was on September 2, 2022.

44.     From January 12, 2023, to May 25, 2023, the data collected from the GPS tracker affixed to WOODEN's vehicle showed that he traveled to Cleveland, OH on more than one occasion. The GPS data, along with the data generated from a Federal pen register/trap and trace

17

on WOODEN's cellular telephone, has placed him in the immediate area of several of the properties that were purchased and owned by the various LLCs, created by MUSICK, discussed above.

45.     On February 1, 2023, investigators conducted surveillance on WOODEN in Cleveland, OH. He was observed at one of the residences purchased by CCMW Investments LLC, incorporated MUISCK. WOODEN was operating a rental vehicle that was determined to be owned by Avis/Budget Group. WOODEN has been observed operating several rental cars also owned by Avis/Budget Group.

46.     Between March 5-6, 2023, the data from the GPS tracker affixed to the WOODEN's vehicle, also corroborated by data obtained from an E-911/PRTT on WOODEN's cellular telephone, indicated that WOODEN traveled to Detroit, Michigan. The call detail records (CDR's) indicated he communicated with Carl CAMPBELL during that trip. Specifically on March 6, 2023, a location ping with a radius of 52 meters indicated that WOODEN was within the area of Golden Sun Jewelry, located at 23077 Greenfield Rd, Unit 318, Southfield, MI 48075. Previously obtained records indicated that WOODEN had shopped at this jeweler utilizing the alias of LITTLEFIELD. Those records indicated that WOODEN aka LITTLEFIELD had spent more than $55,000 U.S. currency at Golden Sun Jewelry. Additionally, while reviewing the WhatsApp conversation between McDougald and WOODEN, investigators identified where WOODEN directed McDougald to that same jeweler to make a purchase. Investigators know that WOODEN maintained a bank account in the name of LITTLEFIELD where he deposited and/or spent $434,768 in cash proceeds derived from the sale of controlled substances.

47.     On June 6, 2023, investigators conducted surveillance on WOODEN beginning in Central Ohio and traveling to Cleveland, OH. During this trip, WOODEN, was accompanied by

another individual, [REDACTED] who is associated with the DTO. The two traveled to Cleveland, OH in a vehicle that had been rented by WOODEN, however [REDACTED] drove the vehicle while WOODEN rode in the back seat. Upon arriving in Cleveland, OH, they traveled to more than one of the homes that was purchased by the numerous LLCs incorporated by MUSICK. Investigators observed as WOODEN met with multiple individuals who appeared to be contractors while [REDACTED] waited separately and uninvolved in the conversations.

48.     On July 28, 2023, your affiant identified from the data generated on a pen register/trap and trace associated to WOODEN's telephone that he had traveled to Southern California. The data indicated that WOODEN traveled on or about July 26, 2023, from the John Glenn International Airport in Columbus, OH. Investigators also observed that the WOODEN's vehicle was not parked in front of the residence. With the assistance of the Airport Police, his vehicle was located, parked in the long-term parking lot connected to the main terminal.

49.     Investigators later learned that WOODEN and MUSICK held a wedding ceremony in Laguna, California on August 1, 2023. Beginning in approximately January 2023, MUSICK incurred expenditures in relation to the wedding ceremony. Those expenditures are as followed but not limited to: $29,909.24 wire transfer to Feritta MLB Owner LLC, which appears to be associated with billionaire restauranteur and sports team owner Tilman Fertitta; $47,291.16 wire transfer to Marjorie Beauvil Michaud, a wedding planner; $11,812.17 payment to Discover Card from which the balance was accumulated from vendors such as Isabella Invitations, which specialized in wedding invitations ($2,977.77); Montage Laguna Beach, a resort hotel ($2,939.49); Butterfly Floral Designs ($4,384.38); and Jettly Private Jets ($2,665.04). Additional payments to JPMC card from which the balance was accumulated from vendors such as Newport Star LLC, a yacht rental company based in Newport Beach, CA ($10,740.85); Disneyland ($1,374); and

another payment to Montage Laguna Beach, resort hotel ($3,128.94). MUSICK also incurred expenses on FTB card as follows: wire transfer to Butterfly Floral and Event Design located in Los Angeles, CA ($65,726.83); wire transfer to Wasserman Music ($15,000); and a wire transfer to "DJ Meel" a music disc jockey ($5,500). Other expenses MUSICK accumulated were through purchases made at Jimmy Choo ($1,095), and to Stanlo Photography, a wedding photographer ($9,900.)

50.     Investigators have continued to conduct surveillance at the TARGET PREMISES. Both WOODEN and MUSICK continue to be observed freely coming and going from the TARGET PREMISES. In addition, their known vehicles have both been observed at the TARGET PREMISES. The black 2021 Cadillac Escalade, registered to MUSICK, is most often parked in the attached garage and the black 2023 GMC Sierra, registered to WOODEN, is most often parked on the driveway of the TARGET PREMISES. On or about October 15, 2024, investigators observed both WOODEN and MUSICK at the TARGET PREMISES. According to the Fairfield County Auditor's website, MUSICK remains the listed owner of the TARGET PREMISES.

51.     Your affiant submits, based upon the information set forth above, and upon training and experience, that the TARGET PREMISES is likely to contain evidence that will aid in developing further evidence of the co-conspirators' illegal narcotics trafficking activities, including further establishing a pattern of the trafficking, money laundering, and engaging in monetary transactions in property derived from specified unlawful activities.

52.     Additionally, from my training, education, experience, and conversations with other investigators that the following information is consistent with the information set forth in this affidavit. It is my experience that currency transactions that are conducted enable those individuals involved with large-scale criminal activity and money launderers to invest the cash

proceeds of their illicit businesses into an asset, thereby legitimizing the currency.

- That those individuals involved with large scale criminal activity are known to trade items in their possession for items of monetary value such as firearms;
- That those individuals involved with large scale criminal activity conduct various transactions, including the purchase of vehicles and real estate, in order to create an appearance that their income is derived from legitimate sources.
- That those individuals involved with large scale criminal activity must maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing criminal enterprise;
- That those individuals involved with large scale criminal activity and money launderers maintain books, records, receipts, notes, ledgers, and other papers relating to the sale of narcotics, and the purchase of assets, including vehicles, real estate and other financial instruments;
- That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the individuals have ready access to them, i.e., homes, businesses, and automobiles.
- That it is common for those individuals involved with large scale criminal activity and money launderers to secrete proceeds of their criminal sales, and records of illicit transactions, sources, and customers, in secure locations within their residences, businesses, garages, storage buildings, barns, trailers and safety deposit boxes for ready access, and also to conceal such items from law enforcement authorities;
- That persons involved in such criminal activity and laundering conceal caches of currency, financial instruments, precious metals, jewelry, other items of value and/or proceeds of illicit transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in their criminal activities, in their residences, businesses, garages, storage buildings, barns, trailers, automobiles, and safety deposit boxes;
- That those individuals involved with large scale criminal activity and money launderers commonly maintain addresses or telephone numbers in books, papers, pagers, or cellular phones (and often have multiple cellular phones and pagers) which reflect names, addresses, text messages to, and/or telephone numbers for their associates in the criminal organization, even if said items may be in code;
- That those individuals involved with large scale criminal activity and money launderers frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that these individuals usually maintain these photographs in their residences, businesses, and automobiles;
- That when those individuals involved with large scale criminal activity and money launderers amass large monetary proceeds from the sale of their ill-gotten gains, they attempt to legitimize these profits by utilizing foreign and domestic banks and their

21

attendant services, including securities, cashier's checks, money drafts, wire transfers, letters of credit, brokerage houses, real estate, shell corporations, business fronts, and other methods;

- That those individuals involved with large scale criminal activity and money launderers sometimes store documents and records relating to their co-conspirators, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of their criminal activity and money laundering crimes;
- That courts have recognized that unexplained wealth is probative evidence of criminal activity in which transactions involving large amounts of cash and high profit margins are common, to include those individuals involved with large scale criminal activity;
- That it is common for those individuals involved with large scale criminal activity and money launderers to conceal and store items related to their criminal activity and money laundering within safes, footlockers, boxes, containers and other hidden compartments, and within places that they own or over which they exercise control such as residences, businesses, and automobiles;
- Individuals involved with large scale criminal activity store records of associated criminal acquisition/disposition documents at their residences, businesses, and/or in their vehicles.

## CONCLUSION

53.     Based on the information set forth in this Affidavit, I submit there is probable cause to believe that Charles E. WOODEN, Courtney D. MUSICK, and others both known and unknown have committed violations of the following federal laws: Title 21, United States Code (U.S.C.), Section 846, that is, Attempt or Conspiracy; Title 21, U.S.C., Section 841(a)(1), that is, it shall be unlawful for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance; Title 21, U.S.C., Section 841(b)(1)(A), that is, it shall be unlawful to distribute or possess with intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance; Title 18, U.S.C., Section 1956(h), that is, laundering of monetary instruments; and Title 18, U.S.C., Section 1957, that is, engaging in monetary transactions in property derived from specified unlawful activities.  There is also probable cause

to search the TARGET PREMISES described in Attachment A for evidence, instrumentalities, and/or fruits of the above crimes, as further described in Attachment B.

54.     Your affiant further submits there is probable cause to believe that the property and premises located at 27 Langtree Drive, Pickerington, OH 43146 (TARGET PREMISES), to include any vehicles and outbuildings located on the curtilage, contains evidence and instrumentalities of violations of federal law.

55.     Accordingly, your affiant respectfully requests that this Court issue a warrant authorizing the search of the TARGET PREMESIS, and authorization to search for and seize the items described in Attachment B hereto, incorporated herein by reference.

56.     Your affiant further requests that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. Your affiant believes that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activity, the entire extent of which is not known at this time. Based upon my training and experience, and information I have received from ATF and other law enforcement agents, your affiant knows that criminals actively search for criminal Affidavits and search warrants via the internet and disseminate them to other criminals as they deem appropriate—e.g., by posting them publicly online through different forums. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

23

Teresa Petit, Special Agent

Bureau of Alcohol, Tobacco,

Firearms and Explosives

Sworn and subscribed to me this
15th day of October, 2024.

Magistrate Judge Chelsey M. Vascura
United States District Court
Southern District of Ohio